**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 2185** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Before the Court is plaintiff Charles Williams' ("Williams" or "claimant") motion for summary judgment [22] in which he seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). The Commissioner has filed a cross-motion [27] asking the Court to uphold the decision of the Administrative Law Judge. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment [22] is granted and the Commissioner's cross-motion [27] is denied.

**I.     BACKGROUND**

**A.     Procedural History**

On April 15, 2008, Williams filed his application for period of disability and disability insurance benefits alleging disability beginning September 13, 2007 due to

back problems and high blood pressure.[1]  (R. 205-08.)  His claim was denied initially on

June 23, 2008, and again upon reconsideration on April 9, 2009.  (R. 146-50, 154-58.)

A hearing was held on September 23, 2009 before Administrative Law Judge ("ALJ")

Curt Marceille.  (R. 73-132.)  On October 16, 2009, ALJ Marceille issued a written

opinion denying Williams' application for benefits.  (R. 52-68.)  Williams filed a timely

request for review of the ALJ's decision, but the Appeals Council denied that request on

January 28, 2011.  (R. 5-8.)  The ALJ's decision then became the final decision of the

Commissioner.  *Tumminaro v. Astrue*, 671 F.3d 629, 632 (7th Cir. 2011).

### B.    Medical Evidence

#### 1.    Treating Physicians

##### a.    Kildare Clinic and Clearing Clinic

Williams presented to the Kildare Clinic on November 19, 2002 for evaluation and

treatment of midline low back pain abruptly presenting at work.  (R. 339.)  He denied

any previous low back injury, but described a twenty-five year history of hypertension.

(*Id.*)  Dr. Joan Mankowski examined Williams and noted that he entered the clinic with

"a cane for ambulation with persistent right-sided list."  (*Id.*)  She diagnosed an acute

low back strain and directed Williams to remain off work through the following day.  (R.

340.)  Dr. Mankowski prescribed Cyclobenzaprine and Ibuprofen, and recommended

cold compresses.  (*Id.*)  At a follow-up appointment two days later, Williams' back pain

was improving gradually.  (R. 338.)  Dr. F. Annaba noted tenderness to palpitation in the

---

[1] Williams also filed an application for supplemental security income on April 15, 2008.  (R. 202-04.)  That application was denied on April 22, 2008 because Williams had resources worth more than $2,000.  (R. 135.)  It appears Williams did not seek reconsideration of that denial.

lower back area, mostly on the left side. (*Id.*) She found no muscle spasms or swelling. (*Id.*)

By November 25, 2002, Williams no longer had constant pain, but reported that his pain was triggered with forward flexion. (R. 337.) Dr. Mankowski found that Williams' gait was nonantalgic and his seating and standing postures were unremarkable. (*Id.*) She also noted that Williams was still limited to approximately forty-five degrees of forward flexion. (*Id.*) At a follow-up appointment on December 2, 2002, Williams described a "small knot" in the left low back "rather than pain per se," which was still triggered by forward flexion or by getting up from a seated position. (R. 336.) Dr. Mankowski noted slight tenderness with deep palpitation of the left lower lumbar paraspinal musculature. (*Id.*) Dr. Mankowski determined that Williams could work as long as he avoided "lifting/pushing/pulling more than 50 pounds." (*Id.*) Two days later, Williams reported no problems apart from two "transient bouts of low back pain lasting forty minutes." (R. 334.) The knot in his back was "gradually resolving." (*Id.*) Dr. Mankowski discharged Williams back to full duty work without restrictions and advised him to take Ibuprofen as needed. (*Id.*)

On November 2, 2006, Williams visited the Clearing Clinic after he "slipped on some hydraulic fluid and fell backward striking his right low back on a rear bumper." (R. 331.) He described his pain as a six out of ten and stated that the pain radiated down the "right thigh lateral," but not past his knee. (*Id.*) Dr. James Delis examined Williams and found that his forward flexion was limited to forty degrees due to right low back pain and that extension to ten degrees produced moderate pain. (*Id.*) There was no tenderness to palpitation of the left lumbar paraspinal musculature, minimal tenderness

3

of the lumbar spine, and moderately severe tenderness with palpitation of the right lumbar paraspinal musculature.  (*Id.*)  Williams' rotation and side bending were limited to twenty degrees.  (*Id.*)  Motor strength was 5/5 in the left lower extremity, but "a little weaker on the right lower extremity" due to pain.  (*Id.*)  Dr. Delis diagnosed a lumbar contusion and provided Williams with a Toradal injection.  (*Id.*)  He also prescribed Ibuprofen and told Williams not to return to work the following day.  (*Id.*)

Williams returned to see Dr. Delis the next day, at which time he described his pain as a seven on a ten-point scale.  (R. 328.)  On examination, Dr. Delis noted moderate tenderness to palpitation of the bilateral lumbar paraspinal musculature and the left upper thoracic area.  (*Id.*)  Forward flexion to sixty degrees and extension to thirty degrees resulted in moderate low back pain.  (*Id.*)  Dr. Delis found no neurovascular compromise of Williams' lower extremities, deep tendon reflexes were normal, and his motor strength was 5/5 in both extremities with slight low back pain. (*Id.*)  Straight leg raise was negative on the left, but produced mild low back pain on the right.  (*Id.*)

Dr. Delis ordered an x-ray, which revealed mild curvature of the lumbar spine and "marked narrowing of the L4-5 disk space with large anterior osteophytes and facet hypertrophic changes."  (R. 329.)  The radiologist assessed "moderate degenerative changes of L4-5."  (*Id.*)  Dr. Delis commented that the x-ray showed no evidence of any fractures, dislocation, or joint abnormality, but noted the "arthritic changes."  (R. 328.) Dr. Delis again assessed a lumbar contusion, as well as a left thoracic strain.  (R. 328.) He recommended moist heat and home exercises, and prescribed Cyclobenzaprine. (*Id.*)  As for work restrictions, Dr. Delis determined that Williams should not lift more

than ten pounds, and should not lift or reach over his head. (*Id.*)

A week later, on November 10, 2006, Williams reported he was feeling "better overall" and described his low back pain as a four out of ten. (R. 324.) A physical examination revealed minimal tenderness to palpitation of the bilateral spine. (*Id.*) Flexion to seventy degrees and extension to thirty degrees produced mild low back pain, as did rotation and side bending. (*Id.*) Motor strength of the lower extremities was normal and straight leg raise was negative bilaterally. (*Id.*) Dr. Delis continued to recommend moist heat, exercises, Ibuprofen, and Cyclobenzaprine. (*Id.*) Although Williams advised Dr. Delis that he was laid off the day before, Dr. Delis discharged Williams to full duty with no restrictions based on his belief that Williams suffered only from a muscle strain with no evidence of a herniated nucleus pulposus. (*Id.*)

### b. Dr. Rama Medavaram

Medical progress notes reveal that Williams has been under the care of family practitioner Dr. Rama Medavaram since 1999. The records illustrate a history of hypertension and repeated non-compliance with blood pressure medication and recommendations to see a cardiologist. (*See, e.g.,* R. 316, 318-19, 321.) Although some of the records are difficult to read, it appears that Williams did not complain of any type of extremity pain or back pain until July 22, 2005 when he complained of pain in his left knee. (R. 310.) Dr. Medavaram noted tenderness in the left knee and assessed degenerative joint disease. (*Id.*) Later, on May 14, 2007, Williams complained of low back pain and Dr. Medavaram assessed a low back strain. (R. 307.) Among other things, Dr. Medavaram prescribed Advil. (*Id.*)

On April 21, 2008, Williams reported a ten year history of chronic low back pain

and Dr. Medavaram prescribed Naproxen. (R. 306.) At another appointment, likely in 2008, Williams complained of pain in the knees and lower back and reported a history of "old injuries." (R. 360.) Dr. Medavaram noted a decreased range of motion and tenderness in the right knee, and tenderness in the lumbosacral spine. (*Id.*) He assessed degenerative joint disease and prescribed Motrin, among other things. (*Id.*)

On September 26, 2008, Williams reported that his low back pain worsened with bending and weight bearing. (R. 391.) He continued to complain of joint pain in his knees. (*Id.*) Williams also reported feelings of depression, but denied suicidal thoughts or ideations. (*Id.*) After a physical examination, Dr. Medavaram assessed hypertension, exacerbation of low back pain, depression, and degenerative joint disease. (R. 392.) He prescribed Citalopram for the depression and referred Williams for a psychological evaluation. (*Id.*) Dr. Medavaram noted similar findings and reached similar conclusions on January 23, 2009. (R. 390.)

Also on January 23, 2009, Dr. Medavaram completed a "Arthritis Residual Functional Capacity Questionnaire." (R. 362-64.) Dr. Medavaram reported that he had treated Williams for ten years for low back pain. (R. 362.) He listed his diagnoses as severe osteoarthritis of the lumbosacral spine and a history of hypertension. (*Id.*) Dr. Medavaram also reported that Williams suffered from depression, which affects his pain, and that Williams' symptoms would "constantly" interfere with his ability to pay attention and concentrate. (R. 363.) According to Dr. Medavaram, Williams' condition resulted in a reduced range of motion, abnormal posture, swelling, and muscle spasms. (R. 362.) The condition was treated with Motrin. (*Id.*) Dr. Medavaram also opined that Williams could walk less than one city block before needing to rest, could sit for twenty

minutes at a time before needing to get up, could stand for twenty minutes before needing to sit down, and could sit, stand and/or walk for less than two hours in an eight-hour workday.  (R. 363.)  He concluded that Williams needs a job that permits shifting positions at will in order to relieve his back pain.  (*Id.*)  According to Dr. Medavaram, Williams needed to use a cane while engaging in occasional standing or walking and that he could occasionally lift and carry less than ten pounds.  (R. 364.)  Lastly, Dr. Medavaram noted that Williams would have "good days" and "bad days" and would likely be absent from work more than four days per month.  (*Id.*)

Dr. Medavaram noted Williams' history of low back pain again on June 3, 2009 and July 10, 2009.  (R. 397-99.)

## 2. State Agency Consulting Physicians

On June 5, 2008, Williams underwent a consultative examination with Dr. M.S. Patil.  (R. 350-53.)  Williams complained of "recurrent mild pain and stiffness in his knees, wrists and low back area."  (R. 350.)  He explained that his back pain sometimes radiates to his left leg.  (*Id.*)  Williams denied any major injuries or falls, but stated that his job as a mechanic required a "whole lot of bending and kneeling."  (*Id.*)  He rated his joint pain a six on a ten-point scale, but denied swelling, redness, or a burning sensation.  (*Id.*)  He complained of mild difficulty and pain while bending, lifting more than ten pounds, walking more than two blocks, standing for more than ten minutes, or climbing up or down stairs.  (*Id.*)  Williams said that sitting for more than an hour or two results in cramps in his feet.  (*Id.*)  He reported that he takes Ibuprofen as needed.  (*Id.*)  With respect to his hypertension, Williams stated he takes Vasotec, but denied chest pain, shortness of breath, headaches, dizziness, heart attack, or stroke.  (*Id.*)

Dr. Patil's examination of Williams' spine and back revealed no paravertibral tenderness or spasm and no obvious deformities. (R. 352.) Mild limitations were noted in the range of motion of the lumbar spine. (*Id.*) A neurological exam revealed that all cranial nerve functions were preserved and that reflexes were brisk and equal bilaterally throughout. (*Id.*) Williams' motor strength was "5/5 in all upper and lower extremities" and "there was no sign of muscle wasting or paralysis." (*Id.*) No edema or calf tenderness was noted. (*Id.*) Williams had full range of motion of all joints except for some mild limitations in the flexion of his knees. (*Id.*) As for his hands and fingers, grip strength was 5/5 and Dr. Patil determined that he had no difficulty with fine or gross manipulations in either hand. (*Id.*)

Williams' gait was normal and he did not use an assistive device. (R. 353.) Williams could tandem walk and walked fifty feet normally during the exam. (*Id.*) Dr. Patil did note, however, that Williams had some difficulty with heel and toe walking, as well as getting on and off the examination table. (*Id.*) He also had some difficulty with "squats and arises." (*Id.*) Dr. Patil's examination of all other systems revealed normal results. (R. 351.)

Dr. Patil assessed osteoarthritis, but found no deformity, swelling, tenderness or redness of any joint, normal peripheral pulses and sensation, no shortening of extremities or atrophy of extremity muscles, and no recent trauma or localized neurovascular deficits. (R. 353.) He again noted that "gait, speech, hand dexterity and mentation were normal." (*Id.*) Dr. Patil also cited Williams' 2006 x-ray revealing moderate osteoarthritis. (*Id.*) However, he further noted that Williams' past history was "negative for major orthopedic trauma/surgery, bladder or bowel dysfunction." (*Id.*)

8

Dr. Patil also assessed chronic primary hypertension, but determined that diastolic pressure was normal, vitals were stable, and lungs were clear. (R. 353.) He also referenced Williams' blood pressure medication and his frequent visits to his primary care physician. (*Id.*)

On June 16, 2008, state agency disability consultant Dr. Virgilio Pilapil completed a Physical Residual Functional Capacity ("RFC") Assessment. (R. 341-48.) Dr. Pilapil determined that Williams could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and engage in an unlimited amount of pushing and pulling. (R. 342.) Dr. Pilapil also concluded that Williams could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (R. 343.) Dr. Pilapil based these limitations on Williams' "history of osteoarthritis in the lumbar spine supported by [the 11/3/06 x-ray] showing moderate degenerative changes of L4-5," which "manifests itself in the form of generalized pain upon activity." (R. 342.) Dr. Pilapil also noted the results of the consultative exam, which revealed decreased range of motion in the lumbar spine, but a normal "neuro exam," gait, and station. (*Id.*) Dr. Pilapil found no other postural, manipulative, visual communicative, or environmental limitations. (R. 343-45.) In his closing remarks, Dr. Pilapil commented on claimant's history of high blood pressure "with non-compliance with meds," the lack of an activities of daily living form, and the absence of a treating source statement. (R. 348.)

On April 7, 2009, Dr. Reynaldo Gotanco reviewed the record and found that "the claimant continues to be somewhat limited because of his back pain." (R. 388.) Dr.

Gotanco also found that claimant's "allegations appear partially credible and although his condition does cause some limitations, the limitations are not as significant as what he claims." (*Id.*) Dr. Gotanco ultimately concluded that the medical evidence before him did not change the limitations listed in Dr. Pilapil's initial RFC assessment. (*Id.*)

On March 10, 2009, Williams underwent a psychological evaluation with Alan Long, Ph.D. (R. 367-71.) Williams complained that his hands and wrists were sore and often swell, and that his legs swell up below his knees. (R. 367.) He explained that when he has $50.00, he goes to his doctor to get pills for high blood pressure, a diuretic, and Ibuprofen. (*Id.*) He told Dr. Long that his "doctor says [he has] an enlarged heart." (*Id.*) He also complained of dizziness. (*Id.*) According to Williams, his biggest problem is his back because he cannot bend over or move fast, and he can only lift if he is careful. (R. 368.) He reported that he could lift twenty pounds one or two times a day. (*Id.*) His doctors told him that his "whole back is filled with arthritis," but that there is nothing they can do because he does not have any money. (*Id.*)

When asked about his daily activities, Williams stated that he sleeps during the day because he cannot sleep at night. (R. 368.) He also watches television. (*Id.*) Williams said "it's depressing that [he] don't make any money" [sic]. (*Id.*) Williams also explained that he would "rather work but [he] can't." (R. 369.) Williams further stated that he would "try to work even in pain if someone would hire him." (*Id.*)

Dr. Long assessed major depressive disorder, mild in severity. (R. 368.) Dr. Long also commented that "significant physical problems including arthritis and heart disease indicate that [Williams] will probably have difficulty obtaining a job and if he gets a job he will have problems handling the physical demands of a job that requires

10

physical stamina." (*Id.*)

On April 4, 2009, Dr. Erika Altman completed a Psychiatric Review Technique. (R. 372-85.)  She concluded that Williams suffered from a "non-severe" affective disorder, specifically major depressive disorder.  (R. 372, 375.)  She found that Williams was only mildly limited with respect to his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (R. 382.)  In her notes, Dr. Altman acknowledged Williams' allegations of back problems and high blood pressure, and noted Dr. Medavaram's reference to depression.  (R. 384.)  Dr. Altman also noted that Dr. Long "addressed prognosis issues based on physical conditions," which "will be addressed by the appropriate discipline on a RFC."  (*Id.*)

### C. Claimant's Testimony

Williams appeared with counsel at the administrative hearing before ALJ Marceille and testified as follows.  Williams was born on July 25, 1951, making him fifty-eight years old at the time of the hearing.  (R. 79.)  Williams graduated from high school. (R. 80.)

Williams worked as a truck mechanic at MGM Transportation from 2000 through 2005.  (R. 80, 290.)  He was laid off because his company was "downsizing."  (R. 82.) However, according to Williams, he doubts he would have continued at MGM even if he was not laid off because he kept going to the doctor.  (R. 84.)  Williams explained that he looked for "mechanical work" after he was laid off, but nobody was hiring at the time. (R. 82.)  He also testified that he looked for work even though he "knew he couldn't do the job" in his condition.  (*Id.*)  Williams collected unemployment insurance benefits from approximately April of 2006 through November 2006.  (R. 80-81.)

When asked about his low back pain, Williams testified that he has had it for seven or eight years, but that it worsened while he was working at MGM. (R. 84.) On a typical day, when he is sitting up straight, Williams rated his back pain a seven on a ten-point scale. (R. 84-85.) At the time of the hearing, he rated his pain at a five, because it was early in the morning. (R. 85.) His back pain gets progressively worse throughout the day. (*Id.*) To relieve his pain, Williams takes prescription Ibuprofen, which helps and allows him "to get up, sit down, [and] use the washroom." (R. 85-87.) Williams has not had any chiropractic treatment or physical therapy, but Dr. Medavaram has prescribed muscle relaxers in addition to the Ibuprofen. (R. 91.) Williams also uses a heat pad at times. (R. 92.) When Williams asked Dr. Medavaram about his back pain, he apparently told Williams the only thing he can do is "check it" because Williams cannot afford to go to another doctor. (R. 90-91.)

Williams also testified about the pain and swelling in his hands, which he suffers from every day, and which worsened the year prior to the hearing. (R. 87-88.) He rated his hand pain at a six out of ten and explained that the Ibuprofen helps relieve the pain to a four or five. (R. 88.) Williams also suffers from swelling in his left leg and knee pain, which can last anywhere from three days to a week. (R. 88-89.) The Ibuprofen helps relieve this pain as well. (R. 89.)

According to Williams' testimony, he sees Dr. Medavaram three to four times a month for his high blood pressure and back pain. (R. 89-90.) Although Dr. Medavaram is attempting to control his blood pressure, Williams sometimes gets dizzy. (R. 90.) On occasion, Williams also suffers from chest pain and shortness of breath. (R. 97-99.) As for Williams' depression, he testified that he gets depressed "thinking about what's

12

going to happen in the future...with my back." (R. 92.) He takes Citalopram, which helps. (R. 93.) Williams denied memory loss or suicidal thoughts. (R. 94.) As a general matter, Williams does not have difficulty focusing or concentrating, although sometimes his pain makes it difficult to concentrate and his energy level is often low. (R. 93-95.)

Williams testified that he can walk two blocks, or about thirty minutes, before getting tired, stand for thirty-five to forty minutes, and sit for about an hour at a time. (R. 101-02.) On a frequent basis, Williams can lift approximately fifteen pounds. (R. 102.) He has difficulty twisting things, but has no problem carrying things in general. (R. 102-03.) Williams testified that he uses a cane about once or twice a month when his pain is "real[ly] bad." (R. 107-08.) Williams also has difficulty bending over. (R. 96.)

On a typical day, Williams gets up, makes a sandwich, and feeds and lets out the dog. (R. 104.) He also watches television, plays checkers once or twice a week, and sometimes gets coffee with his brother. (R. 103-05.) Williams does not cook, clean or shop, but testified that he never did these things in the past. (R. 105-06.) He does do the dishes and sometimes does the laundry, although he has difficulty carrying the laundry basket. (R. 106.) Williams also takes out the trash and mows the lawn. (R. 107.)

**D.    Medical Expert's Testimony**

Medical Expert ("ME") Dr. Sheldon Slodki also testified at the hearing. ME Slodki first identified Williams' impairments as "osteoarthritis [of the] right knee, hands and wrists," "low back pain radiating to the left leg," hypertension, and depression. (R. 110.) He then explained that he did not agree with the RFC assessment of Dr. Pilapil

13

indicating that Williams could perform medium work because it was "too extensive." (*Id.*)  According to Dr. Slodki's review of the record, Williams could perform work at the light level, meaning he could lift twenty pounds occasionally and ten pounds frequently, and could stand, walk, and sit for six hours in an eight-hour day.  (R. 111.)  Dr. Slodki also testified that, because of his intermittent cane use, Williams should never climb ramps, ropes or ladders, and could only occasionally balance, stoop, kneel, crouch, or crawl.  (R. 111-12.)  Dr. Slodki did recognize that there was no indication in the record as to when the cane was prescribed, if ever.  (R. 113.)

Dr. Slodki also acknowledged Williams' testimony regarding his difficulty with his hands and concluded Williams could occasionally use his hands.  (R. 112.)  He also testified that Williams should avoid extreme heat and cold and avoid all hazards.  (*Id.*)

Next, claimant's counsel asked the ME the basis for his conclusion that Williams could perform light work, in particular that he could stand and walk six hours in an eight-hour day.  (R. 113-14.)  ME Slodki explained that his conclusion was based on "the lack of documentation of radiologic severity."  (R. 114.)  ME Slodki did acknowledge that Williams might not be able to perform light work on days when he suffered from increased pain.  (R. 115.)

ALJ Marceille and ME Slodki then had the following exchange:

> **ALJ:** Doctor, let's strip off all the testimony, based just on the medical record, would you arrive at the same RFC?
> **ME:** That's what I based my RFC was on the medical record [sic].
> **ALJ:** Just on the medical record?
> **ME:** Yes.
> **ALJ:** Because you mentioned you're basing some of it, you said, on the testimony you heard today, in particular the cane use, which I think you said is not documented in this record apart from the treating doctor. There's no indication when it was prescribed?

> **ME:** Right.
> **ALJ:** So if we strip out everything, all the testimony, what is this medical [record] documenting?

(R. 115-16.)  The ME then went on to explain that the medical record documents knee, hand, and wrist problems, in addition to a longitudinal problem with low back pain, which has worsened at times.  (R. 116.)  He also explained how, in his view, Williams' testimony was consistent with that documentation.  (*Id.*)  ME Slodki did recognize that "there is no indication of extremely severe pain because the pain medication hasn't been increased to narcotic level."  (R. 117.)  However, when asked by claimant's counsel whether it appears claimant was exaggerating, ME Slodki responded in the negative.  (R. 118.)

Lastly, the ME explained that based on Dr. Patil's notations regarding Williams' difficulties getting off the table, toe walking and heel walking, Dr. Slodki concluded that Dr. Patil found a "mild decreased range of motion due to pain, even though he didn't find it on the exam."  (R. 119-20.)  MD Slodki acknowledged that Dr. Patil did not find any limitations in Williams' ability to engage in gross and fine manipulations with his hands.  (R. 120.)

### E.    Vocational Expert's Testimony

Vocational Expert ("VE") Stephen Sprauer also testified at the hearing.  ALJ Marceille first asked the VE whether a hypothetical individual of claimant's age, education, and past relevant work experience, who is limited to medium work, could perform Williams' past relevant job as a truck mechanic.  (R. 122.)  VE Sprauer responded that such an individual could not perform Williams' past relevant work because, in his opinion, that position is performed at the heavy level.  (*Id.*)  But, the VE

15

did state that such an individual could perform other jobs, including laundry laborer and dining room attendant.  (R. 123.)

Next, the ALJ asked the VE to consider a hypothetical individual with the limitations set forth by ME Slodki.  (R. 123.)  According to the VE, "from a manipulation standpoint," all jobs would be eliminated but the "counter rental clerk" position, which requires only occasional manipulation.  (R. 124.)  If the manipulation limitation is removed, the individual could work as a parking attendant, small parts assembler, or a routing clerk.  (R. 124-25.)  VE Sprauer also testified that he did not believe Williams has any transferrable skills from his past relevant work.  (R. 125.)

When claimant's counsel asked whether an individual could perform the routing clerk position with a third-grade reading level, the VE responded that he could not.  (R. 126.)  In the VE's opinion, a third-grade reading level would limit an individual to "very repetitious [jobs] that would not require him to be processing new information on a regular basis."  (R. 126-27.)

Counsel for the claimant then asked the VE whether a need for a cane two to three days a month would impede an individual's ability to work as a parking attendant. (R. 128-29.)  The VE responded that it was "employer dependent," but that it would create a problem in the small parts assembler position.  (R. 129.)

II.    ANALYSIS

   A.    Standard of Review

The court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting* Steele, 290 F.3d at 940).

Furthermore, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.   Analysis under the Social Security Act

To qualify for disability insurance benefits, the clamaint must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To

17

determine whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001).  At step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Marceille followed this five step analysis.  At step one, he found that Williams had not engaged in substantial gainful activity since September 13, 2007.  (R. 57.)  At step two, the ALJ determined that Williams had the following severe impairments: osteoarthritis and hypertension.  (*Id.*)  However, ALJ Marceille found that Williams' depression did not amount to a severe impairment because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (*Id.*)  ALJ Marceille then concluded that Williams does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (R. 59-60.)

Next, ALJ Marceille assessed Williams' residual functional capacity and determined that he could perform the full range of medium work as defined in 20 CFR §

18

404.1567(c).[2] (R. 60-66.) But, because the requirements of Williams' past relevant work outweighed his RFC, the ALJ found that he would be unable to perform any past relevant work. (R. 66.) Lastly, at step five, ALJ Marceille found that given Williams' capacity to perform a full range of medium work, his age, education, and work experience, Medical Vocational Rule 203.15 directed a finding of "not disabled." (R. 67.) The ALJ further explained that based on the VE's testimony, there are jobs that exist in significant numbers that Williams could still perform such as laundry laborer and dining room attendant. (*Id.*) As a result, the ALJ entered a finding of not disabled. (R. 68.)

Williams now argues that the ALJ (1) erroneously rejected the opinion of Williams' treating physician, Dr. Medavaram; (2) erroneously rejected the opinion of ME Slodki; and (3) failed to properly assess his credibility. We address these issues in turn below. Before doing so, we note that Williams has also raised a concern that the ALJ applied an incorrect standard of review. Like the Commissioner, we find that the statements of the ALJ on which Williams relies in support of this contention were taken out of context. We are confident that ALJ Marceille applied the proper standard of review.

### C.      The ALJ Did Not Err in Discounting Dr. Medavaram's Opinion.

According to Williams, ALJ Marceille erroneously rejected the opinion of Dr. Medavaram set forth in the Arthritis RFC Questionnaire. As explained above, Dr.

---

[2] As defined in the regulations, "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR § 404.1567(c).

Medavaram concluded that Williams' condition limits him to sub-sedentary level work. Specifically, Dr. Medavaram stated that Williams could not sit or stand for longer than twenty minutes at a time, could not walk one block, and could not sit, stand, or walk for even two hours in an eight-hour workday. (*See* R. 362-64.) ALJ Marceille decided to give Dr. Medavaram's opinion "no significant weight." (R. 64.) We find no reversible error in this decision.

As set forth in 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *See also, Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If an ALJ chooses to reject a treating physician's opinion, he must provide a "sound explanation" for doing so. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(c)(2)).

Here, in discrediting Dr. Medavaram's opinion, ALJ Marceille first explained that his RFC assessment was "overly conclusory" and "not based on objectively quantifiable medical findings that are consistent with the record." (R. 64.) This alone would likely support the ALJ's decision to give Dr. Medavaram's opinion little weight. *Burnam v. Astrue*, No. 10 C 5543, 2012 WL 710512, at *12 (N.D. Ill. Mar. 5, 2012) ("An ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings.") (quotation omitted). But, more importantly, ALJ Marceille recognized that Dr. Medavaram's assessment was not only inconsistent with the other physicians' opinions, but also inconsistent with Williams' own testimony regarding his capabilities. For example, while Dr. Medavaram limited Williams to twenty

minutes of sitting or standing, Williams himself testified that he could sit for up to an hour and stand for up to forty minutes at a time. Given such inconsistencies, we easily conclude that ALJ Marceille provided a sound explanation for affording Dr. Medavaram's opinion no significant weight.

### D. The ALJ Failed to Properly Consider ME Slodki's Opinion.

Williams next argues that the ALJ erred by rejecting the opinion of ME Slodki. Again, ME Slodki disagreed with Dr. Pilapil's conclusion that Williams could perform a full range of medium work. Instead, according to ME Slodki, Williams could only perform light work. ALJ Marceille rejected ME Slodki's opinion, stating that it "was based heavily on the claimant's subjective testimony rather than objective findings in the record, despite his statement that his opinion was at least partially based on the objective medical record." (R. 65.) Citing the exchange between the ALJ and the ME, which we have included above, Williams argues that the ALJ's "characterization of the testimony is inaccurate and fails to justify the rejection of Dr. Slodki's opinion." (Pl.'s Br. at 7.) On this point, we must agree.

"The regulations instruct ALJ's that state agency reviewing consultants and medical experts are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *Browning v. Astrue*, No. 10 C 7129, 2011 WL 5042048, at *5 (N.D. Ill. Oct. 20, 2011); *see also,* 20 C.F.R. § 404.1527(e)(2)(i). As with a treating physician's opinions, the ALJ must evaluate a medical expert's opinion using the factors set forth in 20 C.F.R. § 404.1527(a)-(d), "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other

21

factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). Of course, as always, the ALJ must build a logical bridge from the evidence to his conclusion. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Here, given ME Slodki's testimony, we simply cannot conclude that ALJ Marceille built a logical bridge supporting his decision to reject ME Slodki's opinion. While we recognize that ME Slodki commented on Williams' testimony at the hearing, when asked point blank whether his RFC assessment was based on the medical records, he responded in the affirmative. He then simply went on to explain how Williams' testimonial complaints were consistent with the objective record. In our view, this does not undermine ME Slodki's testimony that he reached his RFC assessment based on the medical evidence of record.[3]

Furthermore, as Williams now argues, and as ME Slodki himself explained at the hearing, with respect to Williams' back and knees, Dr. Patil did find some limitations and reduced range of motion. The ALJ failed to address how these consistent findings, which are undoubtedly relevant to Williams' ability to sit, stand, and walk, still led him to reject the ME's opinion.

We also note, as did Williams, that the distinction between medium and light level work is of particular importance here given Williams' age, education, and work experience. Indeed, if the ALJ had determined that Williams could perform only the full range of light work, and that he had no transferable job skills, Medical-Vocational Rule

---

[3] Unfortunately, ALJ Marceille's mischaracterization of the testimony is not cured by his only other assertion on this point, that is, the inconsistency between ME Slodki and Dr. Patil's opinions as to Williams' ability to engage in gross manipulations.

202.06 would direct a finding of disabled.[4]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

The Commissioner has not disputed the importance of this distinction.[5]

For these reasons, we agree that the ALJ failed to properly consider ME Slodki's

opinion.  Of course, we reach no conclusion as to what amount of weight, if any, ME

Slodki's opinions should be afforded on remand.

### E.     The ALJ's Credibility Finding

In light of our decision to remand this matter, we comment only briefly on

Williams' contention that the ALJ failed to properly assess his credibility.  As the

Commissioner points out, in discrediting Williams' allegations of extreme limitations, the

ALJ addressed many of the factors set forth in SSR 96-7p, 1996 WL 374186.  But,

particularly suspect to this Court is the ALJ's heavy reliance on Williams' routine and

conservative treatment and his history of noncompliance with medication.  Naturally,

"infrequent treatment or failure to follow a treatment plan can support an adverse

credibility finding where the claimant does not have a good reason for the failure or

infrequency of treatment."  *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citing SSR

96-7p).  However, the ALJ should not draw any inferences from such a failure "unless

the ALJ has explored the claimant's explanations as to the lack of medical care."  (*Id.*)

Here, Williams testified that Dr. Medavaram told him there was nothing more to

be done for his back due to his limited income.  Williams also reported a similar

---

[4] ALJ Marceille did not address the issue of transferability of job skills as it was not material to his decision after he determined Williams could perform a full range of medium work.  (R. 67.)  We do note that VE Sprauer briefly testified that he did not believe Williams had any transferable job skills.  (R. 125.)

[5] In fact, the Commissioner provided little in the way of meaningful analysis on the issue of whether the ALJ improperly discounted ME Slodki's opinion.

statement to Dr. Long during his psychiatric evaluation.  Unfortunately, the ALJ did not address Williams' minimal income as a possible explanation for his failure to undergo more aggressive treatment, such as physical therapy, chiropractic treatment, or surgery. On remand, the ALJ should take care to do so.  Additionally, with respect to Williams' noncompliance with medication, our review of the record reveals that he failed to comply with his blood pressure medication, not his pain medication.  This distinction and its significance, if any, should also be addressed on remand.

## III.   CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: April 30, 2012**

24